2003 WY 111

**WYOMING BANK AND TRUST, a Wyoming Corporation, as Assignee–Lienor of certain Mechanics Liens, and as Mortgagee under certain Mortgages, Appellant (Plaintiff),**

v.

**Janet HAUGHT, an individual, Appellee (Defendant).**

No. 02–115.

Supreme Court of Wyoming.

Sept. 9, 2003.

Rehearing Denied Oct. 7, 2003.

See also 7 P.3d 906.

Representing Appellant: Dale W. Cottam and Kathleen C. Yarger of Hirst & Apple-

gate, P.C., Cheyenne, Wyoming. Argument by Mr. Cottam.

Representing Appellee: Michael R. O'Donnell and Rhonda Sigrist Woodard of Woodard & O'Donnell, P.C., Cheyenne, Wyoming. Argument by Ms. Woodard.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

HILL, Chief Justice.

[¶ 1] Wyoming Bank and Trust (the Bank) appeals an order of the district court awarding priority to a judgment lien creditor, Janet Haught (Haught), over its mortgages on two tracts of land owned by Joshua Guetzkow and used as collateral for a series of loans to GCI, Inc. We conclude that the Bank was not on inquiry notice of any claims by Haught to the property, reverse the district court's decision, and remand to the district court for consideration of the effect of Wyo. Stat. Ann. § 1–17–302 (Michie 1997) (repealed in part by Wyo. Sess. Laws 1999, ch. 190, sec. 1) on Haught's claim.

## ISSUES

[¶ 2] In its appeal, the Bank states four issues:

Can a mortgagee be put on inquiry notice of a fraudulent conveyance when there is no indication of any title defects in the real estate records and the mortgagee has no actual knowledge of any adverse claim to the real estate?

When a judgment creditor voluntarily releases her judgment liens affecting real estate, has she waived her right to claim priority over a mortgagee who has properly recorded its mortgages?

Can a lender-mortgagee be charged with inquiry notice when such lender-mortgagee conformed to banking industry standards when investigating and extending the loans in connection with the mortgages?

Can a lender-mortgagee who has lent $420,000 for the improvement of real estate be denied the value of the improvements it funded, thus allowing a judgment creditor a windfall?

Haught phrases the issues before us in two, succinct questions:

1. Did the Judgment of the District Court correctly apply the standards of inquiry notice?

2. Are the factual findings of the District Court supported by substantial evidence?

## FACTS

[¶ 3] The dispute in this case is over which creditor, the Bank or Haught, should be granted priority on their liens against two parcels (Tracts 3 and 4) of property formerly owned by GCI, a company owned and operated by Gerald Guetzkow and his son, Joshua. In 1996, Haught obtained a default judgment for $55,591.83 against GCI based on claims that GCI had negligently constructed her house. Haught agreed to have the default judgment vacated in exchange for a lien against Tracts 3 and 4, which were located in a subdivision being developed by GCI. On June 16, 1997, the parties entered into a settlement agreement wherein Haught agreed to release her liens, and GCI agreed to repair the construction defects in her house. On June 2, 1998, Haught filed suit against GCI alleging that it failed to perform under the terms of the settlement agreement. Twenty-four days after Haught's suit was filed, Gerald Guetzkow had GCI transfer ownership of Tracts 3 and 4 to his 18–year-old son, Joshua Guetzkow. After a trial, Haught obtained a judgment against GCI for $66,363.36, which was affirmed by this Court on appeal. *See G.C.I., Inc. v. Haught,* 7 P.3d 906 (Wyo.2000). With her trial judgment in hand, Haught filed suit against GCI and the Guetzkows in November of 1999 seeking to set aside the transfer of Tracts 3 and 4 as fraudulent.

[¶ 4] While the litigation with Haught was proceeding, GCI continued to develop its subdivision. To finance its business, GCI entered into a relationship with the Bank in early March of 1998. GCI initially obtained two loans from the Bank on a house that they had constructed in the subdivision because they had outstanding bills that needed

to be paid prior to the scheduled closing.[1] The Bank learned during this period that GCI had transferred the ownership of all of its property, including Tracts 3 and 4, to Joshua Guetzkow. Gerald Guetzkow informed the Bank loan officer that the purpose of the transfer, along with Joshua Guetzkow's appointment as president of GCI, was to get his son started in the construction business. GCI repaid these loans when the property was sold.

[¶ 5] Beginning in August of 1998, the Bank granted a series of mortgages to GCI on Tracts 3 and 4: $200,000 on Tract 3 recorded on September 3, 1998; $60,000 on Tract 4 recorded on January 29, 1999; an additional $40,000 on Tract 3 and another $40,000 on Tract 4 on March 26, 1999; and an additional $50,000 on Tract 4 recorded on June 1, 1999. On June 8, 1999, the Bank loaned a final $20,000 and consolidated all the other mortgages on Tracts 3 and 4 into a single loan. The final mortgage amounted to $410,000 and was recorded on June 10, 1999. The Bank issued the loans based upon a financial statement filled out by Gerald Guetzkow and a commitment from First American Title Insurance Company that showed Joshua Guetzkow as the owner and that there were no liens against the property.

[¶ 6] GCI defaulted on its mortgage, and the Bank filed this action to foreclose on August 16, 2000. Haught was named as defendant on the basis of her status as a judgment creditor of GCI. Haught's action against GCI and the Guetzkows for fraudulent conveyance was consolidated into the Bank's foreclosure action.[2] In claiming that the Bank's mortgages were not entitled to priority, Haught cited a series of facts that she contended should have given a reasonable lender notice of her adverse claim against GCI and the Guetzkows: (1) tax liens against Gerald Guetzkow; (2) Gerald Guetzkow's statement to the effect that he had structured GCI to avoid creditors (specifically, Gerald Guetzkow referred to his wife with

whom he was involved in a contested divorce at the time); (3) the unprofitable nature of GCI; (4) the transfer of Tracts 3 and 4 to Gerald Guetzkow's 18 year old son; (5) the use of the transferred property as security for loans to GCI; (6) the lack of truthfulness exhibited by Gerald Guetzkow; and (7) the failure of the Bank to require Gerald Guetzkow to fully complete the Bank's financial disclosure forms before making the loans. Haught contended that all of these facts, which were known to the Bank at the time it made the loans, taken together should have placed it on notice to inquire further into the finances of GCI and the Guetzkows. Any reasonable inquiry, Haught argued, would have disclosed her pending litigation against GCI and the Guetzkows filed in June of 1998.

[¶ 7] The district court agreed with Haught:

7. The facts recited above, and known by the Bank at the time it was preparing to loan $200,000 to GCI, Inc., required the Bank to inquire further into the financial condition of GCI, Inc., as well as Gerald and Joshua Guetzkow. The Bank chose not to do so. In fact, the Bank consciously turned away from the facts of the situation and attempted to remain ignorant of what it might learn. Standing alone, the fact of property being transferred within a family may not be enough to require further inquiry. Standing alone, the fact that Gerald Guetzkow had prior financial difficulties or that his corporation had claims against it may not be enough to require further inquiry. However, the combination of all of the facts known by the Bank (tax liens, corporate structure created to avoid creditors, unprofitable corporation, sudden transfers of valuable assets to an 18 year old son of the individual representing the corporation, substantial loans using the suddenly transferred assets as security, lack of truthfulness by Gerald Guetzkow and lack of diligence by the Bank in

---

1. The house was not on either Tract 3 or Tract 4, and these loans are not at issue here.

2. The Guetzkows failed to appear, and the district court granted judgment in favor of Haught. The district court pierced the corporate veil and held Gerald and Joshua Guetzkow personally

liable for Haught's judgment against GCI. The court also set aside the transfer of Tracts 3 and 4 to Joshua Guetzkow as fraudulent. The rulings against GCI and the Guetzkows are not at issue in this appeal.

obtaining standard information) required the Bank to inquire further.

8. It is clear that had the Bank made even a limited inquiry into the financial condition of GCI, Inc. and the Guetzkows in the summer of 1998, it would have learned of Janet Haught's pending litigation and of the clearly questionable transfer of assets from GCI, Inc. to 18 year old Joshua Guetzkow. Such an inquiry is reasonable and, it is clear from the evidence, would have precluded the Bank from loaning money to GCI, Inc. without first addressing the claims of Ms. Haught.

9. While record title standing alone would show title vested in Joshua Guetzkow without infirmity, the Bank was in possession of knowledge which clearly indicated that this record title may be part of a scheme to defraud creditors. This additional knowledge possessed by the Bank is what gives rise to the duty to further inquire. This information would excite the suspicion of an ordinary prudent person. It is, in fact, clear and convincing evidence of fraud which was brought home to the Bank in no uncertain manner. The Bank consciously turned away from the information and chose to remain ignorant of what the necessities of the situation required. This deliberate refusal to make reasonable inquiry charges the Bank with the facts which would have been revealed.

10. The facts which would have been revealed by reasonable inquiry include, among others, the fraudulent nature of the transfer of Tracts 3 and 4, GCI Subdivision from GCI, Inc. to Joshua Guetzkow. Reasonable inquiry would have revealed the fraudulent transfer either by proper inquiry of Gerald Guetzkow based upon the standard forms used by the Bank in lending money, or by a more thorough search of the public records, particularly local Court records, to determine if creditors['] claims were being defeated by the transfers. The Bank is charged with knowledge of these fraudulent transfers.

The district court established priority for Haught's judgment lien over the Bank's mortgages on Tracts 3 and 4. The Bank has appealed.

## STANDARD OF REVIEW

[¶ 8] When a trial court has made express findings of fact and conclusions of law in a bench trial, we review the factual determinations under the clearly erroneous standard and the legal conclusions *de novo*. *State v. Campbell County School District*, 2001 WY 19, ¶ 41, 19 P.3d 518, ¶ 41, (Wyo.2001) (quoting *Rennard v. Vollmar*, 977 P.2d 1277, 1279 (Wyo.1999)). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Campbell County School District*, ¶ 41 (citing *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 538 (Wyo.1993)). In the alternative: "[A] determination that a finding is against the great weight of the evidence means a finding will be set aside even if supported by substantial evidence." *Id.*

*Davis v. Chadwick*, 2002 WY 157, ¶ 8, 55 P.3d 1267, ¶ 8 (Wyo.2002). If the district court's conclusions of law are in accordance with law, we will affirm it; if not, then we will correct it. *Roberts v. Estate of Randall*, 2002 WY 115, ¶ 11, 51 P.3d 204, ¶ 11 (Wyo. 2002).

## DISCUSSION

[¶ 9] A mortgagee is considered to be a purchaser entitled to bona fide purchaser protection. *First Interstate Bank v. First Wyoming Bank*, 762 P.2d 379, 382 (Wyo. 1988). In order to attain bona fide purchaser status, the burden is on the purchaser to demonstrate that he is: (1) a purchaser in good faith; (2) for valuable consideration (not a gift); (3) with no actual, constructive, or inquiry notice of any alleged or real infirmities in the title; and (4) prejudiced by cancellation or reformation of the instrument. *Id.* (citing *Crompton v. Bruce*, 669 P.2d 930, 935 (Wyo.1983)).

[¶ 10] The question in this case is whether or not the Bank was on notice of an alleged or real infirmity in the title to Tracts 3 and 4. Actual notice is knowledge of another purchaser's claim of interest. 14 Richard

Roy Powell on Real Property § 82.02[1][d][i] (Michael Allan Wolf, ed.2003). Constructive or record notice is notice of all properly recorded claims and is inferred as a matter of law. *Id.,* at § 82.02[1][d][ii]. There is no claim that the Bank had actual notice or that the title record disclosed Haught's claim. The focus here is on inquiry notice, which we have defined as "knowledge of facts so informing that a reasonably cautious person would be prompted to inquire further." *Bummer v. Collier,* 864 P.2d 453, 458 (Wyo. 1993) (quoting *Miller v. Alexander,* 13 Kan. App.2d 543, 775 P.2d 198, 204 (1989)). A leading authority has described the concept in this way:

[iii] Inquiry Notice.

. . . .

Inquiry notice, as used herein, arises from a legal inference. A subsequent purchaser may have actual (or even constructive) notice of some fact. However, that fact is not that another person has a claim to the property. Instead, the notice of some apparently extraneous fact. However, it is a fact that is sufficiently "curious" or "suspicious," according to normal human experience, that the purchaser should, as a matter of law, make an investigation into it. If, upon making the investigation into this first fact a second fact, namely that another person has a claim to the title of the property, is revealed, then the purchaser is considered to have inquiry notice of the claim itself. In other words, because of the nature of the first fact, of which the purchaser has actual or constructive notice, a rebuttable inference is made that the purchaser has notice of the second fact. However, if a reasonable inquiry would not reveal the second fact, then the inference is rebutted.

Because this notice is based upon a legal inference, the purchaser cannot avoid notice of the second fact by merely failing to make the inquiry. The rule is often stated that when the facts suffice to impose the duty of investigation, the purchaser is charged with notice of what a proper investigation would have revealed, whether the investigation is made or not. Ignoring this principle quickly renders the doctrine of inquiry useless. However, if the search, even though not conducted, was certain to be futile, no notice should be imputed. This statement is consistent with the prior principle, because the fact that the search would be futile indicates that a reasonable inquiry would have revealed no information that could be charged to the purchaser. Perhaps a better title for this form of notice, as defined here, would be *inferred notice,* or more specifically, *notice inferred from secondary facts.* [Emphasis in original.]

The last two subsections noted that a person who has actual or constructive notice of a particular claim may have an obligation to inquire into the evidence to ascertain the validity of the claim. In contrast, a person with inquiry notice or inferred notice does not have notice of the claim itself; she merely has notice of some extraneous or secondary fact. Inquiry is necessary to disclose whether any claim exists. If she ascertains that a claim exists, then the purchaser is obligated to further investigate the evidence to determine the validity of the claim. This two-step process of inquiry is quite different from the one-step inquiry into the validity of a claim that may be necessary for actual or constructive notice.

With inquiry notice, the purchaser must watch for those "curious" or "suspicious" facts that give her notice that she should inquire further. Exactly how inquisitive or distrustful a purchaser must be has been the subject of considerable debate. Professor Philbrick has asserted, in an extensive argument, that the standard should be reasonableness from the perspective of the ordinary person purchasing real estate in the purchaser's situation at the time of the purchase. This means that a court should find an obligation to inquire only from those extraneous or secondary facts that, by ordinary human experience, suggest a genuine potential for a defect. In addition, the extent of the inquiry necessary to satisfy the burden of investigation must be governed by some standard of reasonableness. A more exacting standard would give unwarranted protection to prior unrecorded interests at the expense

of subsequent purchasers, contrary to the general purpose of the recording acts to protect a subsequent purchaser from an unrecorded prior interest.

14 Powell on Real Property, § 82.02[1][d][iii] (footnotes omitted). Inquiry notice, then, has two parts: (1) extraneous or secondary facts that suggest a genuine potential for a title defect; and (2) a reasonable inquiry based on the existence of those facts would disclose a claim by another person to the title of the property. However, notice will not be imputed to a purchaser if a reasonable inquiry would not disclose a claim to the property.

[¶ 11] In this case, the district court held that various facts known to the Bank suggested that GCI and the Guetzkows were engaged in fraud and that a reasonable inquiry would have disclosed Haught's claim. We conclude that the district court erred by charging the Bank with inquiry notice. The record does not support the district court's conclusion that a reasonable inquiry would have disclosed any claim by Haught to the title of Tracts 3 and 4.

[¶ 12] At the time the Bank initially issued its first mortgage on Tract 3, Haught had already filed her action against GCI for breach of the settlement agreement. That action did not assert any claim against Tracts 3 and 4. Haught obtained and recorded her monetary judgment against GCI on June 16, 1999, six days after the Bank had recorded the final, consolidated mortgage on Tracts 3 and 4. At no time during the period when the Bank was issuing the mortgages on Tracts 3 and 4 was there an assertion by Haught of a claim against those properties. Any reasonable inquiry by the Bank would not have disclosed any defect to the title to Tracts 3 and 4.

[¶ 13] Haught was not without means for alerting third parties to any claims that she may have had against Tracts 3 and 4. Under Wyoming law, Haught could have filed a notice of lis pendens. *See* Wyo. Stat. Ann. §§ 1–6–106 to 111 (LexisNexis 2003). The very purpose of a notice of lis pendens is to "warn all persons that certain property is the subject matter of litigation, and that any interests acquired during the pendency of the suit are subject to its outcome. The

notice is for the purpose of preserving rights pending litigations." Black's Law Dictionary 947 (7th ed.1999). A common type of the litigation that triggers the lis pendens doctrine includes actions to impress a lien on specific property for the payment of a debt. 14 Powell on Real Property, § 82A.02[4][a]. Absent a notice of lis pendens, Haught's suit against GCI for breach of the settlement agreement did not constitute a claim against Tracts 3 and 4.

[¶ 14] In her brief, Haught stresses that the Bank should have been on notice that the transfer of Tracts 3 and 4 to Joshua Guetzkow was fraudulent. However, that fact would only trigger the duty to investigate. For a purchaser to be charged with inquiry notice, a reasonable investigation must disclose a claim to the title of the property. Under these circumstances, Haught had, at most, a potential claim on GCI's property through a judgment lien. A possibility or probability is not sufficient to impute inquiry notice on a purchaser:

> [I]nquiry notice should be held to exist only when the purchaser has such information as must, in the court's opinion, have led him by reasonable investigation to "full information," to "a complete knowledge of all matters." ... [T]he purchaser should have not merely knowledge of the *existence* of a prior conveyance, but *such appreciation of it as a superior title as can fairly be attributed to him on the issue of good faith* ... **[T]he ultimate ascertainable fact that bars *bona fides* cannot be merely such as might deter a reasonably prudent man from proceeding with a purchase. It is not a defensible use of the recording acts to bar good faith by notice of mere possibilities, or even probabilities, of an outstanding claim. It is, on the contrary, the duty of the courts to divest the earlier unrecorded title unless inquiry notice is truly the equivalent of record notice. It is not enough to confront him with the legal problem, the solution of which by a court perhaps few could predict.** [Italics in original; bold supplied.]

14 Powell on Real Property, at § 82.02[1][d][iii] fn. 116 (quoting Philbrick,

*Limits of Record Search and Therefore of Notice* (pts.1–3), 93 U. Pa. L.Rev. 125 at 271 (1944–45)). The Bank's knowledge of the fraudulent nature of the transfer of the property from GCI to Joshua Guetzkow is not sufficient by itself to impute inquiry notice because the ultimate question here is not the wisdom of the Bank's business decision to lend money to GCI; it is whether a reasonable investigation would have disclosed a claim by Haught to the title to Tracts 3 and 4. There is no evidence that a reasonable investigation would have disclosed to the Bank that Haught had a claim; therefore, inquiry notice should not have been imputed. The district court's decision is reversed.

[¶ 15]   At the time Haught filed her action against GCI and the Guetzkows in June of 1998, Wyo. Stat. Ann. § 1–17–302, read:

**The lands and tenements within the county in which judgment is entered are bound for the satisfaction thereof from the first day of the term at which judgment is rendered,** but judgments by confession and judgments rendered at the same term in which the action is commenced shall bind the lands only from the day on which the judgments are rendered. All other lands as well as goods and chattels of the debtor are bound from the time they are seized in execution.[3]

(Emphasis added.)   Haught raised this claim below but the district court did not address it.   Accordingly, we remand this matter to the district court for consideration of Haught's claim in respect to § 1–17–302.

[¶ 16]   Reversed and remanded.

---

**3.**   Wyo. Stat. Ann. § 1–17–302 was amended in 1999 to read:

The lands and tenements within the county in which judgment is entered are bound for the satisfaction thereof from the day the judgment is filed with the county clerk.   Whenever a judgment is required to be filed with the county clerk, it shall be recorded in the real estate records.   Goods and chattels of the debtor are bound from the time they are seized in execution.

Wyo. Sess. Laws 1999, ch. 190, sec. 1. The legislature grandfathered actions filed prior to the July 1, 1999 effective date of the amendment: This act shall apply to all civil actions filed on or after the effective date of this act.   Nothing in this act shall affect the validity or preference of a lien of any civil action filed prior to the effective date of this act.

Wyo. Sess. Laws 1999, ch. 190, sec. 2. Haught's action against GCI was filed on June 2, 1998, well before the effective date of the 1999 amendment.